UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
J & J SPORTS PRODUCTIONS, INC.,

                              Plaintiff,

                                                    **ORDER**
            -against-                               17-CV-6833 (ADS) (GRB)

BRENTWOOD VETERAN WAR
MEMORIAL, INC., an unknown business entity
d/b/a BRENTWOOD VETERANS MEMORIAL
a/k/a BRENTWOOD VFW,

                              Defendant.
-----------------------------------------------------------X

**GARY R. BROWN, United States Magistrate Judge:**

        In a letter dated December 2, 1863, President Abraham Lincoln recognized the obligation

that citizens of this country have to our nation's veterans:

            Honor to the soldier and sailor everywhere, who bravely bears his
            country's cause. Honor, also, to the citizen who cares for his brother
            in the field and serves, as he best can, the same cause.

For more than a century, the Veterans of Foreign Wars ("VFW") has provided veterans refuge,

voice and services.  As one former U.S. Senator noted:

            Americans often ask me what makes the VFW unique.  How is it
            different from a host of other veterans' organizations?  Besides
            being the oldest major group of ex-servicemen and women in
            America, the VFW has a special appeal.  Membership has always
            been based on more than simply wearing the uniform—itself a noble
            gesture.  VFW members all served overseas in an actual war zone
            or in a situation demanding arduous duty.  The camaraderie that
            results from such sacrifice is legendary.  Bonds formed in combat
            are not easily dissolved.  VFW's founders, fresh from campaigning
            in the tropics of Cuba and the Philippines at the century's turn,
            readily recognized this reality of war.   And VFW's prestige is
            undeniable:  eight Presidents have been among its ranks, ranging

1

from Teddy Roosevelt and Harry Truman to George Bush . . . While the VFW may be best known as an organization that has provided a center for social life in small town America, it is much more.[1]

A local VFW post, such as the facility operated by defendant Brentwood War Memorial, Inc. ("Brentwood VFW"), can serve as a "place [ ] where veterans can gather and, if needed, help one another deal with their often unsettling military experiences."[2]  Indeed, one Vietnam veteran recently observed about the Brentwood VFW:

This place is a tool for me to reach other veterans who don't have hope.  This place is my way of giving back.[3]

Unfortunately, however, in recent years "[v]eterans halls, which sprang up on Long Island in great numbers following World War II, have increasingly fallen into disrepair, as many of their members have become too old to help with the upkeep."[4]

This was true of the Brentwood VFW, a modest, low cinderblock building constructed just north of the Southern State Parkway in 1956.  Just over a year ago, in a televised appeal for assistance to rebuild the kitchen and repair the roof of the Brentwood VFW, Sabrina Lacy, Suffolk County VFW Commander, noted

We all have to play a part.  The part we want to play is to feed the hungry, house the homeless and give back to our communities.[5]

The appeal succeeded.  A local business owner agreed to fund the renovation at an estimated cost

---

[1] The Honorable Charles Hagel, writing in HERBERT MOLLOY MASON, VFW, OUR FIRST CENTURY (1999).

[2] The Honorable Christine Pellegrino, quoted in Martin C Evans, *Brentwood VFW post to get renovated kitchen thanks to donor*, NEWSDAY, Nov. 9, 2017 (*available at* https://www.newsday.com/long-island/suffolk/brentwood-vfw-donation-1.14878873).

[3] *Id.*

[4] *Id.*  Reportedly, five such troubled veterans' halls on Long Island have closed in recent years.

[5] Sabrina Lacy, *Brentwood VFW post to get renovated kitchen thanks to donor*, NEWSDAY, Nov. 9, 2017 (*available at* https://www.newsday.com/long-island/suffolk/brentwood-vfw-donation-1.14878873).

of $20,000, while state legislators committed to pursuing legislation to make state grant money available for similar situations.[6] "This is the most important thing we can do for veterans today," one legislator noted.[7]

J & J Sports Productions, Inc. ("J & J"), a frequent litigant noted for slapdash filings, intransigence in the face of repeated judicial criticism, and frequent disregard of law, procedure, and rules, seeks to vindicate its purported intellectual property rights for an alleged violation by the Brentwood VFW. Moving for default judgment, J & J's president asks that this Court levy "the maximum allowance for statutory damages" upon the not-for-profit Brentwood VFW, which he characterizes as a "commercial establishment" and a "pirate organization." DE 9-3, ¶ 14.[8] Specifically, J & J seeks judgment of $24,000, $31,000, $110,000 or $170,000 (depending on which of plaintiff's documents one examines) plus an undefined amount of attorneys' fees and legal costs against the Brentwood VFW. J & J demands this relief based upon conclusory allegations that an unidentified individual improperly aired a pay-per-view boxing match at the post, while collecting a $5 cover charge. These demands are predicated on filings which raise legal questions, an incomplete evidentiary record, and claims which other judges have

---

[6] *Id.*

[7] *Id.*

[8] This action does not represent J & J's first enforcement action against not-for-profit organizations like the Brentwood VFW. One legal journal, in commenting on litigation by J & J brought by the same counsel noted that "do-good organizations like Elks and Moose lodges— even American Legion posts—have been caught up with private lawyers who pay armies of freelance investigators to go into establishments and document pay-per-view theft." Terry Carter, *Who's the pirate? Lawyers join forces to fight allegedly bogus claims of pay-TV theft*, ABA JOURNAL, Oct. 2016 (*available at* http://www.abajournal.com/magazine/article/pay_tv_theft_claims); *see, e.g., J & J Sports Prods., Inc. v. Cal City Post No. 476*, No. 1:10-CV-00762 AWI, 2011 WL 2946178 at *11 (E.D. Cal. July 21, 2011) (imposing $1,600 in damages upon default judgment against an American Legion post).

characterized as dubious.  Unresolved issues include the propriety of service, the statutory and

contractual bases for J & J's claims, incongruities in the evidence presented, and scant

justification for the amount of damages sought.  The problems pervading the application fall into

two general categories:  (1) in its haste to obtain relief, J & J has resorted to what may well be

deficient service, failed to demonstrate that a not for profit entity like the VFW is liable under

applicable law, provided inadequate justification for the amount of damages sought, and made

allegations and supplied factual materials which, taken together, raise substantial questions as to

whether J & J has valid claims and (2) J & J raises legally deficient arguments and pleadings

notwithstanding repeated criticism, and sometimes outright rejection, of such claims by judges of

this Court.

Thus, for the reasons set forth herein, a report and recommendation by the undersigned

must await a hearing at which a fuller record can be made regarding these issues.  Therefore, this

motion is deemed withdrawn pending a hearing.  Of course, if, at the hearing, plaintiff can

establish the requisite elements, the undersigned will proceed with an appropriate

recommendation.  Nevertheless, irrespective of the outcome of any such hearing, the Court

directs additional relief to ensure that the issues presented—some of which J & J has tried to

dodge in the past—will not escape review in the future.

### PROCEDUAL HISTORY

This action was commenced by the filing of a complaint on November 21, 2017.  Docket

Entry No. ("DE") 1.  Thomas P. Riley, Esq., counsel for J & J, filed a motion for *pro hac vice*

admission, representing that the matter "involves claims of commercial signal piracy and

infringement, an area of telecommunications law, which movant counsel specializes in

exclusively." DE 5 at 1. Riley certified that he had "a long-standing attorney/client relationship with the instant plaintiff, having filed hundreds of commercial signal piracy actions in the United States District Courts within the last decade." *Id.* at 3. Riley's *pro hac vice* motion demonstrates the careless, boilerplate nature of J & J's filings. For example, Riley certifies that he "has familiarized himself with . . . the Local Rules of this Honorable Court." However, he predicates his application upon "Local Rule 83.1(d)," a rule which does not exist. *See* DE 5 at 1–2. Furthermore, he seeks relief from the "local counsel requirement" provided in "Local Rule 83.1(d)(2)(B)," another non-existent section, as this Court has no local counsel requirement. *See id.* at 2. Such repeated invocation of non-existent rules calls into question Riley's sworn representation that he became familiar with this Court's rules. Despite these deficiencies, the undersigned granted Riley's *pro hac vice* motion. Electronic Order dated November 22, 2017.

A summons was returned indicating service of process on the Brentwood VFW on February 10, 2018. DE 6. In that summons, a process server purports to have effected service by delivering a copy to "Sabrina Lacy as Managing Agent . . . in compliance with state statutes." DE 6. No state statute is specified, nor is any factual basis offered for the assertion that Lacy is a managing agent.[9] Based on that proof of service, plaintiff moved for a Certificate of Default, which was entered by the Clerk on March 27, 2018. DE 8. On October 23, 2019, J & J filed the

---

[9] The website of the New York State Senate lists Sabrina Lacy as part of its Veterans' Hall of Fame, noting that she served as a "volunteer" at the post, which raises a question about her status as a managing agent. Further, the site provides a description of her exemplary service as a citizen and veteran, which is too long to reproduce here. *See* The Honorable Philip M. Boyle, NEW YORK STATE SENATE, May 15, 2018, *available at* https://www.nysenate.gov/newsroom/articles/phil-boyle/sabrina-lacy; *see also Leger v. Kalitta*, 16-CV-6545 (PKC)(PK), 2018 WL 2057142 at *3 (E.D.N.Y. Jan. 26, 2018) ("the Court may take judicial notice of documents retrieved from official government websites") (quoting *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015)).

instant motion for a default judgment, which was referred to the undersigned on October 30,

2018. DE 9; DE 10.  This Order follows.

## FACTS

### A. The Complaint

The complaint in this action, pressed from the same mold as hundreds of others filed by

J & J in this judicial district, sets forth the following allegations:

J & J represents that it "was granted the exclusive nationwide commercial distribution

(closed-circuit) rights to Manny Pacquiao v. Chris Algieri WBO World Welterweight

Championship Fight Program, telecast nationwide on Saturday, November 22, 2014," including

"all under-card bouts and fight commentary encompassed in the television broadcast of the

event" (the "Program").  DE 1 at ¶ 15.  After obtaining these rights, J & J "entered into

subsequent sublicensing agreements with various commercial entities throughout North America,

including entities within the State of New York, by which it granted these entities limited

sublicensing rights, specifically the rights to publicly exhibit the Program within their respective

commercial establishments in the hospitality industry (i.e., hotels, racetracks, casinos, bars,

taverns, restaurants, social clubs, etc.)" and "expended substantial monies marketing, advertising,

promoting, administering, and transmitting the Program to its customers."  *Id.* at ¶¶ 16–17.

Plaintiff defines the Brentwood VFW as the entity which "operates the commercial

establishment doing business as Brentwood Veterans War Memorial a/k/a Brentwood VFW

located at 140 Wurz Street, Brentwood, New York," and "is specifically identified on the New

York State Liquor Authority License (License Serial No. 1045402)."  *Id.* at ¶¶ 7–8.  The

complaint conclusorily alleges that the Brentwood VFW "specifically directed or permitted [its]

employees [ ] to unlawfully intercept and broadcast Plaintiff's Program at [the Brentwood VFW] or intentionally intercepted, and/ or published the Program at [the Brentwood VFW] itself." *Id.* at ¶ 11. It further concludes that the Brentwood VFW "had an obvious and direct financial interest in . . . the unlawful interception of Plaintiff's Program," such that the purported broadcast "resulted in increased profits" for the defendant. *Id.* at ¶¶ 12–13. Tracking the statutory language, the complaint states that the alleged "unauthorized interception, reception, publication, exhibition, divulgence, display, and/or exhibition by the Defendant was done willfully and for purposes of direct and/or indirect commercial advantage and/or private financial gain." *Id.* at ¶ 19. No specific facts are alleged in support of these conclusions.

Based on the allegations, the complaint seeks imposition of damages under both 47 U.S.C. § 605 and 47 U.S.C. § 553, amounting to $170,000 in statutory damages for willful violations, plus attorney's fees, legal costs and other relief.

## B. Factual Materials Submitted on the Motion

### 1. Plaintiff's Affidavit

In support of this motion, plaintiff submits an affidavit from Joseph Gagliardi, the President of J & J.[10] Gagliardi describes under oath that J & J "purchased and retains the exclusive commercial exhibition (closed circuit) licensing rights" to the subject program. DE 9-3 at 1. He similarly testifies that "[o]ur company thereafter marketed the sub-licensing (commercial and nonresidential exhibition) rights to our company's commercial customers," effectively expanding "commercial exhibition" rights to include "nonresidential exhibition"

---

[10] While it has no effect on this motion, it is interesting that news reports suggest that Joseph Gagliardi's son, Nick Gagliardi, operates G & G. *See*, *e.g.*, https://www.nightclub.com/promoting/webinar-recap-how-to-profit-pay-per-view-events.

rights, though nothing is offered in support of this exegesis. *Id.* The tension remains throughout his affidavit, as he similarly reports that "the Program was legally available to *commercial establishments*, including those in New York, only through an agreement with Plaintiff." *Id.* at 2 (emphasis added). Gagliardi provides the "Closed Circuit Television License Agreement" (the "License Agreement") that purportedly provided J & J with the rights he describes. *Id.*

Gagliardi explains that the company experienced an erosion of sales "[w]ith the advent of pay-per-view programming," and thus "embarked upon a nationwide program to police our signals for the purpose of identifying and prosecuting commercial establishments that pirate our programming." *Id.* He refers to the Investigator Affidavit, described below, and notes that "at no time did [the Brentwood VFW] ever lawfully license the Program from J & J." *Id.* at 2–3. Gagliardi annexes a "Rate Card" purportedly related to the subject fight, and indicates that the "commercial fee" for the Brentwood VFW would have been $2,000. *Id.* at 3.

To aid the Court in evaluating willfulness, Gagliardi mentions encryption technology and purports to describe "several methods by which a signal pirate can unlawfully intercept and broadcast our programming," including the use of a "blackbox," an "illegal cable drop" or "the purchase of illegal satellite authorization codes." *Id.* Interestingly, buried among these methods is a far more mundane possibility, to wit:

> The purposeful misrepresentation of a commercial establishment as a residential property to allow the fraudulent purchase of pay-per-view (or prohibited) programming at the residential rate, or, notwithstanding the existence of a commercial account, the purchase of the particular Program by a commercial establishment at a residential rate in violation of the terms of service of the business account provider.

*Id.*[11]  At no time does Gagliardi explain the absence of any evidence of which method might have been employed at the Brentwood VFW, even though J & J's investigator was present at the time and could have made observations that would shed light on this question.[12]

Gagliardi, on behalf of J & J, which has obtained hundreds of default judgments in this Court alone, and probably thousands nationwide, unabashedly avers:

> The persistent signal piracy of our programming costs our company, our customers, and their communities, millions of dollars annually resulting, in significant part, from the perceived lack of significant consequences (including nominal or minimal damage awards by the Courts that hear our cases).

*Id*. at 5.[13]  Based upon this premise, Gagliardi asks the Court to:

> grant up to the maximum allowance for statutory damages due to the fact that such actions are per se intentional and, and [sic] do not and cannot occur without willful and intentional acts purposely designed to obtain our programming unlawfully

*Id.*

---

[11] Nowhere in plaintiff papers does counsel reveal that J & J lost a decision before the United States Court of Appeals for the Fifth Circuit holding that this particular scenario—more likely than any other proposed—would not be actionable by J & J.  *See J & J Sports Prods., Inc. v. Mandell Family Ventures, L.L.C*., 751 F.3d 346, 352–53 (5th Cir. 2014) (holding that the "statutory framework of the FCA as a whole also confirms that § 605 does not apply to Defendants' receipt of cable communications").

[12] The investigator affidavit omits an alternate possibility.  While plaintiff's investigator provides no information about the decoding equipment used (*e.g.* whether a DirectTV or cable television box was observed), it is very possible that the Brentwood VFW has a cable programming provider.  Such accounts are readily available for residences and non-residential facilities.  *See e.g*., OPTIMUM, https://www.optimum.net/pricing-packages-business (last visited Aug. 29, 2019) ("Whether your business is a private office, has a waiting area, or caters to patron's in a bar or restaurant, Optimum has the perfect TV package to suit your business needs.").  Account holders are advised that "Ordering Pay Per View is as easy as 1-2-3 - just use your Optimum TV remote control!"  *Id.*

[13] The suggestion that Courts have imposed "nominal or minimal damage awards" in J & J's cases—and therefore have provided inadequate protection of the company's rights, flies in the face of reality.  *See J & J Sports Prods., Inc. v. Concepcion,* No. C 10-05092 WHA, 2011 WL 2220101, at *1 (N.D. Cal. June 7, 2011) (chronicling numerous judgments awarded in favor of J & J, ranging up to $100,000).

Deeming the members of the Veterans of Foreign Wars to be "signal pirates," Gagliardi then shares some of his "experience in the industry" as to the typical conduct of "pirates," explaining that:

- "pirates do not generally advertise the fact that they intend to exhibit our program unlawfully to the public" but that "the unlawful exhibition may well have been promoted by word of mouth or advertising that went undetected by our auditors"

- "it is extremely unlikely that a pirate establishment would increase the costs of food or drink on the evening they broadcast one of our programs unlawfully." At the same time, J & J's "auditors do not benchmark the prices charged for food or drink at the pirate locations subsequent to conducting the field surveillance on the evening our programming is broadcast, and thus it is undetermined whether the prices paid by an auditor at a pirate location on the night of the Program are in fact less than or equal to the normal prices charged by the pirate establishments"

- "the overwhelming majority of pirate establishments do not, and likely will not ever charge a cover or door charge to their customers on the evening our programming is exhibited. To do so would defeat the very purpose of pirating our programming in the first place, i.e., to lure or retain customers who seek to be entertained by our programming."

*Id.* at 5–6. In sum, Gagliardi's "experience" reveals that pirates do not advertise or increase the cost of food or drink on the night of an event—unless they do. Since no evidence is supplied regarding the presence or absence of advertising or changes to the price of food and drink in this case, Gagliardi's syllogisms provide no assistance. The sole unequivocal inference he draws from his experience—that most pirates do not charge a cover price—suggests that the VFW acted in a manner atypical of signal pirates, as the investigator paid a cover charge to gain admission. *See* DE 9-2 at 22.

### 2. The License Agreement

Attached as an exhibit to Gagliardi's Affidavit is a copy of the License Agreement purporting to give J & J certain exhibition rights. The agreement differs from Gagliardi's sworn affidavit in several important respects. First, despite Gagliardi's sworn statement that J & J had rights to license the broadcast to "nonresidential" locations, the agreement expressly constrains J & J to license the program "only at commercial closed-circuit television exhibition outlets, such as bars, clubs, lounges, restaurants and the like, each with a fire code occupancy capacity not to exceed 500 persons per outlet." DE 9-3 at 9. The agreement appears to limit the rights to cable rather than satellite transmissions, as it requires obtaining additional licenses from, for example, direct satellite providers. *Id.* Perhaps most importantly, the agreement excludes J & J from claiming any rights regarding pay-per-view broadcast of the same event, providing that:

> You acknowledge that Promoter will be licensing the live and delayed cable television, direct broadcast satellite television and digital online internet transmissions and exhibitions of the Event in the Territory on a pay-per-view basis, with subsequent pay cable delayed telecasts, and that you shall have no interest or anticipation in such exhibitions.

*Id.* at 12. Thus, despite Gagliardi's broad claims to all "commercial distribution rights," the language of the agreement specifically excludes J & J from claiming any rights to any pay-per-view program ordered via cable, satellite or Internet.

### 3. The Investigator Affidavit

Attached to the declaration of plaintiff's counsel is a form investigation affidavit, submitted by James Osgood, a private investigator.[14] He indicates that on November 22, 2014,

---

[14] Following an inquest in another J & J case, Magistrate Judge James Orenstein had occasion to comment on the "general unreliability of Osgood's testimony." *J & J Sports Prod., Inc. v. El Ojo Aqua Corp.,* No. 13-CV-6173 ENV JO, 2014 WL 4700014, at *1 (E.D.N.Y. Aug. 29, 2014),

at 9:50 p.m., he entered the Brentwood VFW after paying a $5 cover charge. DE 9-2 at 22.[15] He describes the facility as being in "POOR" condition, and specifically makes note of certain "distinguishing items," including "8X10 FRAMED PICTURES OF MILITARY PERSONNEL ON THE WALLS, ARMY, NAVE [sic], MARINES [and] AIR FORCE MEMORABILIA." *Id.* He reports leaving at 10:15 p.m. *Id.* Osgood counted the number of patrons three times, each time noting that a total of 14 people were in the club, though he estimates the establishment's capacity at 50. *Id.* at 23.

He describes observing two flat screen televisions (one 52", one 20") at the bar, on which he saw two and a half minutes of the first round of one of the undercard bouts. *Id.* Specifically, Osgood reports that he saw a few minutes of the match between Lomachenko and Piryapinyo, which he identifies as an "HBO PPV EVENT." *Id.* Although he affirms that he remained inside the Brentwood VFW for 25 minutes, during which time the subject program was purportedly airing, he fails to explain why he was only able to observe a fight on the televisions for less than three minutes. Additionally, no information is supplied as to whether he observed a cable or satellite box, or whether the building (which he apparently photographed in daylight) had a visible satellite dish—all of which would have been critical here.

While Osgood makes no reference to any sort of advertising or promotion of the fight by the Brentwood VFW, Osgood attaches to his affidavit, without explanation or comment, a screenshot of a Facebook page belonging to an unidentified individual. *Id.* at 24. Only the closest examination of the dozens of items on the page reveals the words "11-22 Fight Night

_____

*report and recommendation adopted*, No. 13-CV-6173 ENV JO, 2014 WL 4699704 (E.D.N.Y. Sept. 22, 2014).

[15] The record here is silent as to whether the investigator, who states that he was charged a five dollar cover charge, was a VFW member or represented himself as a member or guest.

Party…@ the B'wood VF Dub." *Id.* While this is presumably the "lead" that brought Osgood to the defendant's facility, the precise implications of this information remains unexplained.

## DISCUSSION

As noted, J & J is a frequent litigant before this Court and other federal courts, having filed hundreds of cases in this judicial district alone. *See J & J Sports Prods., Inc. v. Ferreiras*, No. 15-CV-6546, 2018 WL 6168557, at *1 (E.D.N.Y. Nov. 20, 2018) ("By this Court's count, J & J has brought 474 cases in this District since the advent of electronic filing"). Typically, these cases are dismissed voluntarily, likely due to settlement, or become subject of a motion for default judgment. *J & J Sports Prods., Inc. v. Right Brain Rest., Inc.*, No. 17-CV-1191, 2017 WL 4535928 at *1 (E.D.N.Y. Oct. 10, 2017) ("Plaintiff has initiated hundreds of cases in this District, and has moved for default judgment in over one hundred of them"). In fact, fairly recently, the undersigned has had occasion to handle one such application. *J & J Sports Prods., Inc. v. His & Hers Bar & Lounge Inc.,* No. CV 17-4181 (ADS)(GRB), 2018 WL 4925706, at *10 (E.D.N.Y. Aug. 31, 2018) (recommending an award of $9,470), *report and recommendation adopted*, No. 17-CV-4181, 2018 WL 4922912 (E.D.N.Y. Oct. 9, 2018) ("*His & Hers"*).[16]

As such, there is no shortage of published caselaw as to the general standards to be applied here. For the sake of convenience, the undersigned will incorporate by reference the discussion of the default judgment standard, the standard for imposition of liability under 47 U.S.C. § 605 as well as the discussion of considerations of calculating damages contained in *His & Hers* as if fully incorporated herein.

---

[16] Curiously, and again without explanation, in its application, J & J attaches a single, unreported, decade-old district court determination on summary judgment in one of its cases. *J & J Sports Prods., Inc. v. Isaacs*, No. CV-06-3385 (E.D.N.Y. Dec. 4, 2008).

Amid that vast body of caselaw are a number of opinions criticizing the practices and filings by J & J and its counsel, several of which have already been discussed. In a recent, exhaustive, well-reasoned decision, Magistrate Judge Bulsara provided a helpful summary of J & J's litigative efforts before this Court:

> This is one of hundreds of cases that J & J has initiated in the Eastern District of New York. By this Court's count, J & J has brought 474 cases in this District since the advent of electronic filing. With rare exception, the defendant fails to appear, and J & J moves for default judgment. J & J's motions for default judgment have been denied at a dizzyingly high percentage. Since 2005, judges in this Court have ruled on 139 motions for default judgment and denied, in whole or in part, 34 of those motions, a staggering 24.5%. For cases initiated since 2015, judges have ruled on 19 motions for default judgment and have denied, in whole or in part, 16 of them, an astonishing 84.2%.

*Ferreiras*, 2018 WL 6168557 at *1 (recommending denial of default judgment motion).

*Ferreiras* painstakingly summarizes many of the prior decisions and identifies a number of concerns with J & J's claims that are fully applicable to the instant case. Judge Bulsara begins his analysis by noting:

> Judges have taken time to issue detailed written decisions outlining the bases for denying the motions, the reasons for which are manifold: failures to serve the defendant with a complaint, to serve all the defendants against whom default is sought, to serve the authorized agent of a corporation as opposed to any employee, and to follow the Court's Local Rules for motions for default judgment, including by failing to attach time and cost records or other necessary documents, among other reasons. And the failures are procedural as well as substantive. J & J has sought default judgment against individuals without alleging the necessary elements for imposing such liability, sought certificates of default against parties not named as defendants, served the incorrect parties, sought recovery under statutes without specifying the section of the statute allegedly violated, brought claims under statutes that prohibit interception of satellite communications without alleging the necessary element of such a claim, submitted affidavits, declarations and papers that contradict the allegations in

the complaint, and alleged infringement of digital rights to programming that it may not own. One could go on. Despite the fact that for years there have been written opinions identifying these inconsistencies, failures to comply with rules, and deficiencies, J & J has apparently never bothered to change its practices. It submits the same cookie-cutter complaints, applications, and motions in almost every case, changing only the name of the defendant and never curing the problems. And it continues to submit supporting materials that obviously contradict the statements in the motions and complaint, which causes the Court to question whether even the most basic investigation has been conducted by J & J before filing suit. One District Judge has ordered J & J to show cause why sanctions should not be issued for its persistent practice of filing identical complaints riddled with the same basic deficiencies. Another District Judge has asked J & J to explain why sanctions should not be issued for its repeated failures to abide by the Judge's individual practices, including failing to appear at initial conferences. J & J files cases that it permits to languish on the docket, without filing proof of service or taking any steps to prosecute the action; when prompted by a judge to prove up its case, it dismisses the action or fails to respond to the Court order. Of the 474 cases, fewer than a handful have proceeded to any discovery and none have proceeded to disposition on the merits. It comes as no surprise then that J & J often obtains a result that should be the rarest outcome: a denial of the default judgment motion on liability.

The present case is sadly no different than the others.

*Id.* at *1–2. Following that introduction to the troubling history of the litigation brought by J & J, Judge Bulsara turned to the specific claims which, unsurprisingly, mirror those in the present case.

### A. Liability Under Section 605(a)

In the complaint, plaintiff alleges that defendant violated 47 U.S.C. §§ 553 and 605, and seeks damages under both statutes. However, as J & J has been repeatedly warned in numerous opinions—including by this writer—"when a defendant's conduct has violated both sections 553 and 605, an aggrieved cable operator is entitled to only one, non-duplicative recovery." *His & Hers*, 2018 WL 4925706, at *3; *J & J Sports Prods. Inc. v. Alvarez*, No. 02-CV-

5173(RPP)(HBP), 2009 WL 3096074, at *4 (S.D.N.Y. Sept. 25, 2009) (same). Moreover, where a defendant's liability can be established under both sections, the Second Circuit has made clear that the court should award damages pursuant to section 605. *See*, *Int'l Cablevision, Inc. v. Sykes*, 997 F.2d 998, 1008-09 (2d Cir. 1993); *see also Garden City Boxing Club, Inc. v. Polanco*, 05 CV 3411 (DC), 2006 WL 305458, at *5 (S.D.N.Y. Feb. 7, 2006), *aff'd*, 228 F. App'x 29, 30 (2d Cir. 2007).

On this motion (and unlike in its complaint herein), J & J seeks imposition of damages only under section 605. However, the allegations fail to satisfy the basic elements of the statute. As the *Ferreiras* opinion explained, "[t]he provisions of § 605(a) . . . are based on interception, publication and/or disclosure of 'radio communications' [which] encompasses a 'satellite communication.'" *Ferreiras*, 2018 WL 6168557 at *6. In distinguishing the two sections, the Second Circuit has held that "Section 605 applies to a considerable body of radio transmissions to which § 553 is inapplicable, while § 553 applies to any transmissions via cable, whether or not they originate as radio transmissions." *Sykes*, 75 F.3d at 133. Thus, since plaintiffs have limited their motion to section 605(a), some aspect of satellite communication must be alleged. The instant complaint fails to allege that the subject transmission was a satellite communication. *See generally* DE 1. Indeed, the word "satellite" does not appear anywhere in the complaint.[17] *See id.* Once again, the motion papers do nothing to rectify this omission. *J & J Sports Prods., Inc. v. Evolution Entm't Grp.*, No. 13-CV-5178, 2014 WL 3587370, at *2 (E.D. La. July 21, 2014) ("The Gagliardi affidavit lists numerous ways in which Plaintiff's programming has been

---

[17] This is not a case, like *His & Hers*, in which allegations concerning satellite coordinates might have satisfied the requisites, though Judge Bulsara makes a compelling argument that even those allegations fail to pass muster.

intercepted from either cable or satellite transmissions, without opining as to what actually occurred in this case").

In this case, counsel for J & J attempts to dodge the difficult questions concerning various subsections of 605 by failing to specifically allege which sections it intends to rely. This fails to remedy the problem.

Substantial questions remain as to the section(s) under which J & J seeks liability and the facts in support thereof. While these questions may warrant the denial of the motion, plaintiff will be permitted to offer evidence to remedy the gaps in the record at a hearing.

## B. The Role of G & G Closed Circuit Events, LLC

In the complaint and other factual materials submitted in this case, J & J and its counsel repeatedly stress that J & J held exclusive rights to license the Program to commercial outlets and that it alone marketed the broadcast to commercial outlets.

However, these assertions stand in marked contrast to the position taken by J & J in another case filed in this district relating to the very same prizefight.[18] In *J & J Sports Productions v. El Sonador Care Restaurant, Inc, et ano.*, 15-CV-6934 (NG)(VMS) ("*Sonador*"), the complaint—filed in December 2015—explains that, in marketing the Pacquiao-Algieri fight broadcast, "the plaintiff utilized the services of G & G Closed Circuit Events, LLC to handle its marketing and sales." *Sonador*, at DE 1 at ¶ 9. Thus, according to the *Sonador* complaint, "the closed-circuit broadcast of the Event could only be exhibited in a commercial establishment if

---

[18] After a default is entered, "the well-pleaded factual allegations set forth in a complaint relating to liability are deemed true." *NorGuard Ins. Co. v. Lopez*, 15-5032(DRH)(AYS), 2017 WL 354209 at * 15 (E.D.N.Y. Jan. 24, 2017). However, "[a] fact is not considered 'well-pleaded' for purposes of a motion for default judgment if it is inconsistent with other allegations of the complaint or with facts of which the court can take judicial notice." *Id.*

said establishment was contractually authorized to do so by J & J Sports Productions, Inc. **and/or it's [sic] sub-licensee G & G Closed Circuit Events, LLC."** *Id.* at ¶ 10 (emphasis added). Plaintiff alleged in *Sonador* that "J & J Sports Productions, Inc. and G & G Closed Circuit Events, LLC contracted with various establishments throughout New York and granted to such establishments the right to broadcast the Event in exchange for a fee." *Id.* at ¶ 11. Ultimately, the complaint alleged that defendants were liable because they broadcasted the fight but "did not, however, contract with J & J Sports Productions, Inc. or its sub-licensee G & G Closed Circuit Events, LLC to obtain the rights to broadcast the Event." *Id.* at ¶ 13.

So pervasive were the allegations about G & G and its relationship to the Pacquiao-Algieri fight, that in granting default judgment, Magistrate Judge Scanlon indicated that the finding of liability rested on the uncontested assertion that "Defendants did not purchase from J & J, or its sub-licensee G & G Closed Circuit Events, LLC, the rights to exhibit the Event." *J & J Sports Prods., Inc. v. El Sonador Cafe Rest. Inc.,* No. 15 Civ. 6934 (NG) (VMS), 2017 WL 598534 at *2 (E.D.N.Y. Jan. 3, 2017), *adopted by*, *J & J Sports Prods., Inc v. El Sonador Cafe Rest. Inc.,* No. 15-CV-6934 (NG)(VMS), 2017 WL 591169 (E.D.N.Y. Feb. 14, 2017).

Moreover, the relationship between G & G and the plaintiff, as well as G & G's rights to license the subject match, remains murky and confusing. For example, the website address[19] listed on the J & J rate card, upon which it expressly relies, belongs to G & G, as evidenced by the following logo on the website. DE 9-3 at 16.

---

[19] www.boxingseries.com



Notably absent from this page is any reference to J & J.[20]   The website represents that:

> G & G Closed Circuit Events is the *exclusive home of the HBO Boxing Series* (HBO World Championship Boxing and HBO Boxing After Dark) for your business. We serve all commercial establishments.[21]

(emphasis added).  Based on this, there may be factual questions as to G & G's right to license

the fight, and conversely, J & J's standing and purported exclusivity.

The issue of G & G's role in licensing broadcasts for which J & J sought damages

became the subject of significant judicial attention, as noted by Magistrate Judge Scanlon:

> In other factually similar actions, there was a question as to whether J & J owned the exclusive right to license commercial displays of an event in light of evidence submitted in support of its motion for default judgment listing G & G as the event's official closed-circuit provider.  For example, Magistrate Judge Orenstein noted in *J & J Sports Prods., Inc. v. El Ojo Aqua Corp.* that plaintiff J & J's evidence included an advertisement listing G & G as the official closed-circuit provider. No. 13 Civ. 6173 (ENV) (JO), 2014 U.S. Dist. LEXIS 136024 (E.D.N.Y. Aug. 29, 2014), *R. & R. adopted*, 2014 U.S. Dist. LEXIS 132980 (E.D.N.Y. Sept. 19, 2014). Judge

---

[20] At one time, the boxingseries.com website displayed a J & J logo.  *See e.g.*, INTERNET ARCHIVE, https://web.archive.org/web/20160224161956/http://www.boxingseries.com/ (last visited Aug. 29, 2009).

[21] G & G CLOSED CIRCUIT EVENTS, http://www.boxingseries.com/about-jjboxing (last visited Aug. 29, 2019).  Although the record is clear that the Algieri-Pacquiao event was made available on HBO pay-per-view, whether the fight belonged to one of these specific series to which G & G claims exclusive rights remains a mystery.

Orenstein found that the plaintiff failed to state a cause of action because the advertisement contradicted the complaint's allegation of J & J's exclusive rights. *Id.*

*Sonador*, 2017 WL 598534 at *2.[22] J & J's reticence, if not outright refusal, to address this issue prompted the following extraordinary ruling by Judge Glasser:

> The Magistrate clearly intended for Plaintiff to address the discrepancy between the Rate Sheet and Complaint to satisfy the court that J & J actually had, and maintained, the proprietary interest required to bring its asserted claims. That order was ignored. Instead, J & J's motion does not discuss G & G and makes no attempt to explain the issue at all. ECF 9, Memo. of Law (stating that the damage amount is the only issue for the Court to decide, repeating the facts alleged in the Complaint virtually verbatim, and mentioning G & G just one time to say it was J & J's sub-licensee); ECF 10, Hooten Aff. (no mention of G & G); ECF 9-2, Gagliardi Aff. (no mention of G & G and alleging only that Exclusive Lounge failed to contract with J & J). By submitting moving papers that are identical to those it has filed in countless other cases, J & J continues "to file this claim without correcting or explaining the evidence that directly contradict[s] the allegations in the Complaint." *Senor de Chalma,* 2016 WL 7655800 at *5. In light of the prior decisions noting these pleading deficiencies in precisely similar cases, Fed. R. Civ. P. 11 is serially disregarded and sanctions pursuant to Rule 11(c)(3) of that Rule will be invoked for its continued disregard.

*J & J Sports Prods., Inc. v. Exclusive Lounge & Grill Inc.,* No. 15-CV-6534, 2017 WL 1082416, at *3 (E.D.N.Y. Mar. 22, 2017).

The repeated criticism of J & J relating to conflicting information about the role of G & G post-dated the filing of the complaint in *Sonador* (again, a case about the very same boxing match), but pre-dated the complaint in the instant case. Tellingly, the instant complaint lacks even a mention of G & G's role in marketing the broadcast or its right to issue licenses. The complaint does not allege that the Brentwood VFW did not obtain a license from G & G,

___

[22] Ultimately, however, in *Sonador,* Judge Scanlon was persuaded that "in this case, the record shows that J & J is the holder of the rights asserted in the complaint." *Sonador*, 2017 WL 598534 at *1, n.1.

which arguably could defeat liability. But more importantly, comparing the complaint in the instant case to that in *Sonador* gives rise to the inference that one of the documents filed is simply false.

Thus, on this record, and combined with the other deficits outlined in this Order, the dramatically different accounts of G & G's role in marketing the subject broadcast weigh in favor of denying the motion for a default judgment, absent a fuller record.

## C. The License Agreement Exclusion for Pay-Per-View Broadcasts

Close scrutiny of the record in this case reveals the License Agreement's exclusion of J & J from any interest in the pay-per-view broadcast of the program, whether via cable, satellite or Internet. As noted above, while Gagliardi makes broad claims to all "commercial distribution rights" on behalf of J & J, the License Agreement provides otherwise. It explicitly notes that the "Promoter will be licensing the live and delayed cable television, direct broadcast satellite television and digital online internet transmissions and exhibitions of the Event . . . on a pay-per-view basis, with subsequent pay cable delayed telecasts" and that J & J "shall have no interest or anticipation in such exhibitions." DE 9-3 at 12. Since in the instant action, the only evidence of record as the method of "interception" by the Brentwood VFW is the investigator's report that he observed an "HBO PPV" program in the club, the documents submitted raise the very real possibility that J & J would have no standing to bring this case as the language of the agreement specifically excludes J & J from claiming any rights to a program ordered via pay-per-view via cable, satellite or Internet. *See* DE 9-2 at 22. This exclusion raises substantial questions as to the establishment of liability here, as the only evidence of record—which is highly incomplete despite plaintiff's "investigation," suggests that the Brentwood VFW obtained access to the

broadcast via a cable pay-per-view broadcast.  *See id.*  Thus, a reading of the plain language of

the License Agreement, suggests that J & J could have had no interest in the exhibition at the

Brentwood VFW.

**D.  Commercial Establishment, Commercial Advantage and Private Financial Gain:**

**Liability as to a Not-for-Profit Entity with a Club Liquor License**

One unresolved question is whether the defendant constitutes a "commercial

establishment" as defined under the License Agreement and whether the subject interception

constituted "commercial piracy" for "private financial gain."  Given that the defendant is a not-

for-profit benevolent organization engaged in helping (and in some cases feeding) veterans,

J & J's conclusory uses of these contractual and statutory terms does not necessarily make it so.[23]

Similarly, conclusory references to "employees" and "profits," without any factual support, do

not establish liability under the Licensing Agreement or the statute.

Notably, although J & J references information gleaned from the Brentwood VFW's

State Liquor License in the complaint, one item that J & J neglected to provide on this motion

was the data from a liquor license search.  *See generally* DE 12-2.  The absence of a State Liquor

License search is remarkable because counsel relies on this publicly-accessible data in

formulating its arguments, and because J & J has provided such searches in the past—including

on motions reviewed by the undersigned and cases related to the very same pay-per-view event.

*See*, *e.g.*, *J & J Sports Prods., Inc. v. Boyd*, No. 2:17-CV-6822 (ENV)(AYS), 2019 WL 316704

(E.D.N.Y. Jan. 24, 2019) ("*Boyd*"); *His & Hers Bar & Lounge Inc.*, 2018 WL 4925706, at *10.

---

[23] The public information about Ms. Lacy, noted above, suggests that she was a "volunteer" at
the Brentwood VFW, raising questions about whether the defendant has "employees" as well as
the propriety of serving process upon a volunteer.

The Liquor Authority website, which J & J has argued to this Court in other cases constitutes "information . . . obtained from an official New York government website" of which this Court may take judicial notice, contains relevant information. *Boyd*, at DE 12-2 at ¶ 15.

The Liquor License data provided by J & J in *Boyd* and *His & Hers* demonstrates that those cases involved "On-Premises" liquor licenses. An "On-Premises" license, generally speaking:

> allows liquor, wine, cider, and beer to be sold for consumption at a restaurant, tavern, nightclub, theater, or other facility. This license is the standard for bars and taverns in New York State.[24]

By contrast, the liquor license data that J & J neglected to submit on this application is a "Club License."[25] As defined under New York State law, such a permit refers to the following:

> "Club" shall mean an organization of persons incorporated pursuant to the provisions of the not-for-profit corporation law or the benevolent orders law, which is the owner, lessee or occupant of a building used exclusively for club purposes, and which does not traffic in alcoholic beverages for profit and is operated solely for a recreational, social, patriotic, political, benevolent or athletic purpose but not for pecuniary gain . . . A "member" of a club shall mean a person who whether a charter member or admitted in agreement with the by-laws of the club, has become a bona fide member thereof, who maintains his or her membership by the payment of his or her annual dues in a bona fide manner in accordance with the by-laws and whose name and address is entered on the list of members; or in the case of a veterans club where a person has in his or her possession an identification card indicating his or her membership in the national veterans' organization with which the club at which he or she is present is affiliated. For the purposes of this section a veterans' club shall include . . . the Veterans of Foreign Wars . . .

---

[24] CITY OF NEW YORK, https://www1.nyc.gov/nycbusiness/description/onpremises-liquor-license (last visited Aug. 29, 2019).

[25] NEW YORK STATE LIQUOR AUTHORITY, https://www.businessexpress.ny.gov/app/answers/cms/a_id/3737/kw/on%20premises (last visited Aug. 29, 2019).

N.Y. Alco. Bev. Cont. Law § 3(9) (McKinney 2019).   Furthermore, "[a] club . . . licensed to sell

alcoholic beverages for on-premises consumption shall be permitted to sell such beverages only

to its members and to their guests accompanying them."  N.Y. ALCO. BEV. CONT. LAW § 106

(McKinney 2019).  Thus, Brentwood VFW's possession of a Club Liquor License appears to

undermine J & J's repeated and continual characterization of the Brentwood VFW as a

"commercial establishment" that was open to the public, as its liquor license restricts service to

VFW members and their guests.   It further calls into question the applicability of J & J's "Rate

Card" (the principal basis of its claim for damages) to the Brentwood VFW, as that document

expressly applies to "commercial establishments."  DE 9-3 at 3.

The existence of the Liquor License leads to a novel argument by J & J, which contends:

> Defendant Brentwood Veteran War Memorial, Inc., as specifically
> identified on the New York State Liquor Authority License, had the
> obligation to supervise the activities of Brentwood Veterans War
> Memorial a/k/a Brentwood VFW, which included the unlawful
> interception of Plaintiff's Program, and, among other
> responsibilities, had the obligation to ensure that the liquor license
> was not used in violation of law.

DE 1 at ¶ 10.  Plaintiff cites no authority supporting the argument that possession of a liquor

license somehow heightens an entity's obligations to comply with federal statutes relating to

allegedly improper access to electronic signals.

In short, the Brentwood VFW's qualification as a not-for-profit entity as well as its Club

Liquor License raises issues as to the applicability 47 U.S.C. § 605 (e)(2), which expressly limits

the imposition of penalties to those who violate the section "for purposes of direct or indirect

commercial advantage or private financial gain."  Moreover, the Brentwood VFW's not-for-

profit status raises questions about the applicability of the License Agreement, which only grants

J & J rights in connection with showing the telecast at "commercial establishments."  None of

these issues can be resolved on the current record.

### E. Service of Process

Another potential defect is the method of service of process. Ms. Lacy is identified on the Liquor License search, which may be plaintiff's basis for concluding that she was a "managing agent." *See* DE 6. However, her identification on the liquor license renders her the "alcoholic beverage officer" whose responsibilities would be limited to "filing all applications and other documents required to be submitted to the authority." *See* N.Y. ALCO. BEV. CONT. LAW § 3 (McKinney 2019). The hearing will address whether the individual served is, in fact, a managing agent for the corporation.

### F. Damages

On this motion, plaintiff seeks: (1) statutory damages pursuant to 47 U.S.C. §§ 605(e)(C)(i)(II), and (2) enhanced damages pursuant to 47 U.S.C. §§ 605(E)(3)(C)(i)(II) and 605(e)(3)(C)(ii). The sum sought by plaintiff is something of a moving target. In its brief, counsel represents that plaintiff "requests $6,000 in statutory damages and $25,000 in enhanced statutory damages," or a total of $31,000. DE 9-1 at 4–5. In his sworn declaration, Riley states that plaintiff is seeking damages "in the amount of $6,000 and $18,000, respectively," totaling $24,000. DE 9-2 at 3. In the affidavit by plaintiff's president, he asks the Court to impose the "maximum" statutory damages, an amount well in excess of $100,000. DE 9-3 at 5. Finally, presumably for the convenience of the Court, counsel provides a form proposed judgment on this motion.[26] DE 9-2 at 18-19. Though the decision concerning damages requires the exercise of

---

[26] "Proposed orders are a convenient way of managing congested dockets, and proposed orders approving unopposed class settlements are particularly attractive to judges in that they clear large cases from the docket in a situation where the likelihood of scrutiny from the Court of Appeals is

considerable discretion and review by the Court, plaintiff's counsel has decided to complete the section on damages by typing figures into the blanks provided totaling $24,000. *Id.* It is, therefore, difficult to know exactly how much plaintiff is seeking.

The fact that plaintiff specifies three different suggested figures for the imposition of damages is not the only problem: the scope, scale, proportion and propriety of the significant sums sought warrant close scrutiny. If J & J establishes liability, it must present further detail as to the appropriate range of damages. The evidence before the Court establishes total revenue from the broadcast of $5, which, if paid by all of the individuals in the club at the time of the investigator's three headcounts, amounted to only $70. The Court will consider any evidence and arguments by plaintiff that could justify the tens of thousands of dollars in damages sought.

## CONCLUSION

Based on the foregoing, the motion for default judgment is deemed WITHDRAWN, pending the outcome of a hearing.

### I. The Hearing

The Court will hold a hearing on November 18, 2019, at 10:00 a.m., at which it will receive evidence and argument on the following questions:

1. What are the factual and statutory bases for asserting that Commander Lacy was a "managing agent" under the statute and that service of process, therefore, was appropriate?

2. What are the statutory and contractual bases for J & J's claim to rights emanating from:

    a. "Non-residential viewing of the subject telecast"?

---

remote." *Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 436 (S.D.N.Y. 2014). At the same time, the misuse of this function by counsel can result in substantial "mischief." *Id.*

      b.   Viewing of the telecast via a pay-per-view purchase?

      c.   Alleged misuse of a residential cable account?

3.   What is Gagliardi's basis for averring that J & J has rights to "non-residential" telecasts as well as for events ordered via pay-per-view?

4.   Does the Brentwood VFW constitute a commercial enterprise under the License Agreement and Rate Card?

5.   Does the showing of a closed circuit telecast by a not-for-profit corporation, such as a benevolent organization like the Brentwood VFW, constitute:

      a.   a showing for commercial advantage and/or private financial gain under the statute?

      b.   exhibition by a commercial enterprise as defined under the license agreement?

6.   Does an event shown in a facility with a Club Liquor License, which is limited by law only to members, constitute:

      a.   a showing for commercial advantage and/or private financial gain under the statute?

      b.   exhibition by a commercial enterprise as defined under the license agreement?

The investigator and process server must be present for the hearing.

It is further ORDERED that counsel for J & J serve a copy of this order by overnight mail upon defendant, as well as the national parent entity for the Veterans of Foreign War. *Pro bono* counsel for the Brentwood VFW will be made available for the purposes of the hearing. Counsel for J & J shall, 14 days prior to the hearing, submit a brief outlining its response to all of the questions set forth above—with an offer of proof containing all exhibits to be offered with a list

of witnesses—as well as any other issues counsel believes should be addressed.

## II.     Remedies Ordered Irrespective of the Outcome of a Hearing

Unearthing the issues discussed in this opinion from the incomplete filings made by plaintiff, the vast accumulation of judicial opinions generated from J & J's "nationwide program to police [its] signals," and the complex technical and statutory framework, can present reviewing judicial officers with significant challenges.  These challenges are further complicated by the context in which these decisions usually arise, to wit:  *ex parte* filing made in support of default judgment applications.  *Ferreiras*, 2018 WL 6168557 at *1 ("with rare exception, the defendant fails to appear, and J & J moves for default judgment").  In that setting, counsel has a heightened duty of disclosure and candor to the Court,[27] yet J & J's counsel has proved remarkably unresponsive to Court directives.  *See Exclusive Lounge & Grill Inc.,* 2017 WL 1082416 at *3 (noting that the Court's "order was ignored" and warning that similar violations would lead to Rule 11 sanctions).  While J & J touts its victories, as with other mass enforcement proceedings, "due to plaintiffs' litigation strategy, which includes avoiding review on the merits except at a preliminary, *ex parte* stage, these determinations were made without any factual record by judges unaware of the highly individualized, fact specific defenses."  *In re BitTorrent Adult Film Copyright Infringement Cases,* 296 F.R.D. 80, 91 (E.D.N.Y. 2012), *report and recommendation adopted sub nom. Patrick Collins, Inc. v. Doe 1,* 288 F.R.D. 233 (E.D.N.Y. 2012).  Taken together, these difficulties warrant additional relief irrespective of the outcome of the scheduled hearing.

---

[27] *See Vill. of Freeport v. Barrella,* 814 F.3d 594, 609, n.60 (2d Cir. 2016) ("We remind counsel that attorneys have an ethical obligation to 'disclose to the tribunal controlling legal authority known to the lawyer to be directly adverse to the position of the client'") (quoting N.Y. Rules of Prof. Conduct 3.3(a)(2)).

Judges in this judicial district have previously warned counsel for J & J that continued practices could warrant serious sanction. *See Exclusive Lounge & Grill Inc.,* 2017 WL 1082416 at *3 (cautioning J & J's counsel about potential Rule 11 sanctions); *see also Ferreiras*, 2018 WL 6168557 at *1 ("Were J & J a *pro se* party that ignored Court directives with such abandon, the Court would have good cause to preclude J & J from making additional filings without first receiving Court permission").

The remedies ordered here are far less intrusive. Pursuant to Fed. R. Civ. P. 1 and this Court's inherent power, and to avoid the waste of additional judicial resources, in furtherance of fairness and in an effort to more efficiently manage this Court's docket, it is hereby ORDERED as follows:

Regardless of the outcome of the scheduled hearing (and indeed, even if such hearing is not held due to voluntary dismissal of this action), counsel for J & J, in all future motions for *pro hac vice* admission and/or motions for default judgment in this judicial district, J & J, or its attorneys, shall attach a copy of this opinion as well as the opinion in *Ferreiras* to the motion papers, advising the relevant judicial officer that they are attaching said decisions pursuant to a court order. This directive shall remain in effect until further order of the Court.

Dated: Central Islip, New York
      August 30, 2018

/s/ Gary R. Brown        
GARY R. BROWN
United States Magistrate Judge
